IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>v.<br><br>DENNIS KIMBALL,<br><br>  Defendant. | Case No. 4:21-cr-146<br><br>**DEFENDANT'S SENTENCING MEMORANDUM** |

**I.    INTRODUCTION**

Defendant Dennis Kimball faces sentencing after pleading guilty to attempted enticement of a minor, in violation of 18 U.S.C. §§ 2422(b) and 2, pursuant to an 11(c)(1)(B) plea agreement. His sentencing is likely to require resolution of the following issues:

(1) Whether to sustain Mr. Kimball's objections to paragraph 16, footnote 3, and paragraph 27 of the Presentence Investigation Report (PSR);

(2) The appropriate sentence to impose;

(3) Whether to impose the special condition of supervision recommended in paragraph 163 of the PSR;[1] and

(4) Whether Mr. Kimball is indigent under 18 U.S.C. § 3014.

Mr. Kimball does not anticipate calling any witnesses or offering exhibits at the sentencing hearing.

Mr. Kimball asks the Court to consider this memorandum in connection with his sentencing.

---

[1] Mr. Kimball withdraws his objections to the special conditions of supervision proposed in paragraphs 165, 166, and 167 of the PSR.

## II. ARGUMENT

By statute, Mr. Kimball faces a mandatory minimum term of ten years' imprisonment, and a maximum of life. PSR ¶ 144. The Court must impose at least five years of supervised release to follow any term of imprisonment. A $100 special assessment is mandatory. If the Court finds Mr. Kimball is non-indigent, the Court also must impose a $5,000 special assessment under 18 U.S.C. § 3014. The guidelines are not in dispute: with a total offense level 33 and criminal history category III, the advisory guidelines recommend a sentence between 168 and 210 months' imprisonment. PSR ¶ 145.

Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), the parties agreed to recommend the Court impose a sentence of not less than 240 months' imprisonment. This agreement reflects a reasonable compromise of the relevant sentencing factors. On the one hand, the agreed-upon sentence is above the advisory guideline range. On the other, the government has agreed to dismiss counts one, three, four, and five, which avoids the possibility that Mr. Kimball is subject to a cumulative 35-year mandatory minimum term of imprisonment.[2] The presence of mitigating factors in Mr. Kimball's background supports the elimination of these mandatory minimums, and likewise supports the imposition of a 240-month sentence.

### A. Outstanding Factual Objections.

Mr. Kimball lodged an objection to the assertion in paragraph 16, footnote 3 that an unsent message indicates a user unsent an image or video file. Any message, including a text message,

---

[2] If Mr. Kimball's 1991 conviction qualified as a predicate offense for the enhanced penalties, count one would have carried a 25-year mandatory minimum instead of a 15-year mandatory minimum. 18 U.S.C. §§ 2251(a) and (e). A violation of 18 U.S.C. § 2250A as charged in count five carries a 10-year mandatory minimum, which must be imposed consecutive to the underlying offense.

can be unsent on Facebook messenger.  Mr. Kimball also objects to the commentary in this paragraph presuming why he might have "unsent" a message.  The footnote also refers to an affidavit and attachment, which are not applicable to the final PSR.  Mr. Kimball proposes footnote 3 be modified as follows to strike the commentary and accurately reflect the meaning of "this message was unsent" on Facebook Messenger:[3]

> ~~According to SA Thomas,~~ [W]hen the chat notes that "this message was unsent," it means that ~~an image or video~~[message] was sent from Facebook user A (in this case **Kimball**) via Facebook Messenger to a Facebook user B (in this case UC), but Facebook user A chose to rescind the [message]~~image~~.  ~~This is presumably done by Kimball to prevent the UC from preserving and obtaining the image that Kimball sent.~~  **Kimball** continues this practice throughout his conversation with UC.  Wherever "This message was unsent" appears in this [section]~~affidavit and sealed exhibit~~, the same applies as outlined here.  [Here, Kimball sent an image of himself and then "unsent" the message.]  The UC did view the image prior to **Kimball** rescinding the image and recognized the image as depicting **Kimball**.  After realizing what **Kimball** was doing, ~~likely in an attempt to prevent documented evidence of **Kimball's** illegal activity,~~ the UC was able to document the images and videos **Kimball** was rescinding by screen recording the Facebook Messenger screen before it was rescinded by **Kimball**.

Mr. Kimball also objected to the inclusion of paragraph 27, which is commentary in nature.  Mr. Kimball responded in this manner because he believed that the person he was chatting with was a scammer.  Mr. Kimball asks the Court to strike paragraph 27.

B.  <u>The Court Should Impose a 240-Month Sentence.</u>

The guidelines are only one of many factors a court must consider in fashioning an appropriate sentence.  *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).  The Sentencing Reform Act instructs courts "to 'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing, including 'to reflect the seriousness of the offense,' 'to promote respect for the law,' 'to provide just punishment for the offense,' 'to afford adequate

---

[3]  Bracketed text is inserted, strikethroughs are deletions from the original.

deterrence to criminal conduct,' and 'to protect the public from further crimes of the defendant.'" *Id.* at 101 (quoting 18 U.S.C. § 3553(a)). To that end, Mr. Kimball asks the Court to impose a sentence of 240 months of imprisonment in light of the following factors.

Mr. Kimball's upbringing did not set him up for success later in life. His biological parents abandoned him with his babysitters when he was just six months old, and Mr. Kimball has not seen his biological parents since. The babysitters eventually adopted Mr. Kimball, but throughout his formative years, his adoptive father, Darrell, was an alcoholic and was physically abusive to Mr. Kimball and Mr. Kimball's adoptive mother, Jean. The abandonment by his biological parents, as well as the abusive environment in his adoptive parents' home, likely presented significant hurdles to his emotional and cognitive development. Parental abandonment "is an especially damaging risk factor that predisposes children to a wide range of psychological and behavioral problems later in life." Craig Haney, *Evolving Standards of Decency: Advancing the Nature and Logic of Capital Mitigation*, 36 Hofstra L. Rev. 835, 870 (2008) (footnote omitted) (hereinafter *Evolving Standards*). Children with unmet attachment needs develop a view of the world as "comfortless and unpredictable; and they respond either by shrinking from it or doing battle with it." *Id.* (quoting John Bowlby, *Attachment and Loss* 208 (1973)). As Craig Haney summarized in *Evolving Standards*,

> Parental abandonment is a unique form of loss, sometimes creating devastating feelings of pain and grief. As one leading researcher on the topic put it, parental abandonment represents a "profound blow to a child's self-esteem and [creates a] sense of degradation . . . due to having been given up, put aside, left, or lost." Abandonment experienced on multiple occasions and in multiple ways, has been recognized as "a traumatic event with the potential for long-lasting intrusive effects . . . [on] the child." It is also likely to produce some symptoms of chronic post-traumatic stress, and is one of the major causes of adolescent depression as well as subsequent dysfunctional behavior and drug use (engaged in as a form of self-medication to ward off the deep feelings of emotional pain that often stem from parental rejection).

*Id.* at 870–71 (footnotes omitted).

The impact of his challenging upbringing was apparent by Mr. Kimball's adolescent years. He dropped out of school in the eighth grade. PSR ¶ 123. At age twelve, Mr. Kimball started smoking marijuana. PSR ¶ 104. By thirteen, he was drinking alcohol and experimenting with inhalants. PSR ¶¶ 105, 106. At sixteen, he added cocaine and LSD into the mix. PSR ¶¶ 107, 108. At age seventeen, he was convicted of burglary as an adult and was sent to prison. PSR ¶ 54. Mr. Kimball's history suggests that he was essentially on his own from a young age, associating with drug users and struggling to cope. A steady criminal history throughout his adult life followed. The kind of emotional trauma Mr. Kimball experienced in his youth undoubtedly had lasting effects, which helps put Mr. Kimball's admittedly aggravating criminal history in perspective.

Later in life, Mr. Kimball was introduced to methamphetamine. Methamphetamine became his preferred substance and his use quickly spiraled into a daunting addiction. PSR ¶¶ 111, 114. He made some progress toward recovery while he was in the Fort Des Moines Residential Reentry Center finishing out a revocation sentence imposed in November 2020. PSR ¶ 68. In October 2021, as he neared his release date, he was in a relationship with Renee Berry, whom he'd been seeing since 2020. PSR ¶ 88. Renee tragically and unexpectedly passed away on October 23, 2021, and Mr. Kimball relapsed. PSR ¶ 88, 114. Mr. Kimball was lonely and sad, and he sought companionship from anyone who would respond to him on various social media and dating websites, including Facebook. It was in the midst of this relapse and grief that Mr. Kimball began Facebook messaging the undercover officer posing as a fifteen-year-old girl. There is no indication that Mr. Kimball specifically sought out a minor and he has no history of sexual abuse of children. While his offense was very serious, the circumstances are somewhat mitigated by Mr. Kimball's

history and addiction, his state of mind at the time of the offense, as well as when compared to an offender who was specifically seeking out a minor.

To fight his addiction, Mr. Kimball knows that he would benefit from additional substance-abuse and mental-health treatment. Sustained sobriety and mental-health care will put Mr. Kimball in the best position to be a productive and law-abiding member of society.

Mr. Kimball is now 58 years old and is not in good physical or mental health. He suffers neuropathy and hypertension, among other conditions. PSR ¶¶ 96, 97. He was recently diagnosed with generalized anxiety disorder and major depressive disorder. PSR ¶ 100.

With the ten-year mandatory minimum alone, Mr. Kimball would be sixty-seven years old at the time of his release.[4] If the Court imposes a 240-month sentence, Mr. Kimball would be seventy-seven years old at the time of his release. He will be at an age at which reoffending is unlikely. According to a Sentencing Commission study, the rearrest, reconviction, and reincarceration rate for offenders sentenced between age 51 and 60 is markedly lower than the rate for younger offenders.[5] U.S. Sentencing Comm'n, *Recidivism Among Federal Offenders* App. A-1 to A-3 (Mar. 2016), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf. For instance, only 11.9% of offenders in Mr. Kimball's age bracket at sentencing were reconvicted for a subsequent crime,

---

[4] Taking into account the year Mr. Kimball has spent in custody related to the instant offense.

[5] Notably, the low recidivism rates hold true even for offenders who are sentenced for committing an offense in an older age bracket. *See* U.S. Sentencing Comm'n, *Older Offenders in the Federal System* 8 (July 2022), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220726_Older-Offenders.pdf (noting that, while some courts sentencing older offenders give less weight to the inverse relationship between recidivism and age because the offender's age at the time of the offense may suggest they are an outlier, "Commission studies have repeatedly demonstrated an inverse relationship between age and recidivism: as an offender's age at sentencing increased, the rate of a later rearrest decreased").

compared to 44.9% in the 21-to-25 age bracket. *Id.* at App. A-2. The recidivism rates continue to decrease for offenders older than sixty at the time of their release. *Id.* at App. A-1 to A-3.

The decrease in recidivism with aging holds true with individuals with prior sex offense convictions. This is not particularly surprising, given that "capacity and desire to engage in sexual activity diminish in old age." *United States v. Craig*, 703 F.3d 1001, 1003–04 (7th Cir. 2012) (Posner, J., concurring).

The costs associated with an even lengthier sentence would outweigh any minimal deterrent value added. Courts have recognized "the incremental deterrent and incapacitative effects of a very long sentence to a somewhat shorter one." *See, e.g.*, *Craig*, 703 F.3d at 1003. At the same time, as Mr. Kimball grows older, the cost to incarcerate him is likely to increase significantly, as "an elderly prisoner costs the prison system between $60,000 and $70,000 a year" as compared to $39,000 annually for the average federal prisoner. *Id.* at 1003. Mr. Kimball asks the Court to take his age into account when deciding on the appropriate sentence.

For the above reasons, a 240-month sentence in sufficient, but not greater than necessary, to address the goals set forth in 18 U.S.C. § 3553(a).

C. <u>The Court Should Decline to Impose the Special Condition of Supervision Proposed in Paragraph 163.</u>

Under 18 U.S.C. § 3583(d), the Court "may impose special conditions [of supervised release] only if three requirements are met." *United States v. Simons*, 614 F.3d 475, 479 (8th Cir. 2010). First, the special conditions must be "reasonably related" to "the nature and circumstances of the offense, the defendant's history and characteristics, the deterrence of criminal conduct, the protection of the public from further crimes of the defendant, and the defendant's educational, vocational, medical, or other correctional needs." *Id.* Second, the special conditions must not be vague or overbroad. *Id.* at 479, 483–85. Third, the special conditions must be consistent with any

pertinent policy statements by the Sentencing Commission. *Id.* at 479. The Court must conduct this inquiry on an "individualized basis." *Id.*

Paragraph 163 recommends the Court impose a special condition of supervision requiring Mr. Kimball submit to periodic polygraph testing "to ensure that [he is] in compliance with the requirements of [his] supervision or treatment program." This condition, as written, would permit the U.S. Probation Office to require Mr. Kimball to take a polygraph at any time, at the U.S. Probation Office's unbridled discretion. The proposed condition is overbroad, unreasonable, and unwarranted. The only stated purpose of the condition is "to ensure . . . compliance with the requirements of [Mr. Kimball's] supervision or treatment program." PSR ¶ 163. But it is not connected, like the search condition proposed in paragraph 173, to any reasonable suspicion of a violation. It would permit the Probation Office to conduct a polygraph examination at its discretion, for any reason, and possibly for no reason, and then require Mr. Kimball to foot the bill for the polygraph examination.

Additionally, the PSR does not reflect any history of non-compliance with court-ordered treatment, or dishonesty regarding compliance with any prior terms of supervision. Mr. Kimball will be subject to the standard condition of supervision requiring him to "answer truthfully the questions asked by [his] probation officer." U.S. Courts, *Appendix: Standard Condition Language (Probation and Supervised Release Conditions)*, https://www.uscourts.gov/services-forms/standard-condition-language-probation-supervised-release-conditions (last visited Nov. 15, 2022). There is no indication that a greater deprivation of Mr. Kimball's liberty is necessary to accomplish the goals enumerated in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3583(d)(2). Accordingly, the Court should decline to impose the special condition of supervision proposed in paragraph 163.

> D. The Court Should Decline to Impose the $5,000 Special Assessment under 18 U.S.C. § 3014 Because Mr. Kimball is Indigent.

Section 3014(a) of Title 18 requires the court to impose a $5,000 special assessment on "non-indigent" defendants convicted of various crimes, including a violation of 18 U.S.C. §§ 2422(b). The Eighth Circuit has instructed that "§ 3014 expressly limits its special assessment to 'non-indigent' persons." *United States v. Kelley*, 861 F.3d 790, 799 (8th Cir. 2017). "[I]n the context of § 3014 indigence determinations, an analysis of both a defendant's current financial situation and his ability to pay in the future is appropriate in determining his 'non-indigent' status." *Id.* at 801.

As an initial matter, Mr. Kimball was appointed counsel based on his current indigency. While this does not ipso facto render Mr. Kimball indigent under § 3014, *id.* at 800–01, it is probative of Mr. Kimball's indigence under § 3014. As for his ability to pay in the future, Mr. Kimball has a negative net worth of $2,507.25. PSR ¶ 138. He has no assets. *Id.* The PSR determined he is unable to pay a monetary obligation due to his financial status. PSR ¶ 143. Mr. Kimball is fifty-eight years old, has a GED and no special skills, and his employment history is fairly limited. PSR ¶¶ 124, 128–136. He faces at least ten years of imprisonment, or twenty if the Court follows the parties' recommendation. Upon his release, Mr. Kimball's earning capacity will be very limited due to his age, employment history, and criminal history including the instant conviction, among other factors. *See United States v. Barthman*, 983 F.3d 318, 323 (8th Cir. 2020) ("Barthman will be nearly 80 years old, if not older, when he is released from custody. Additionally, he will be a convicted felon with several child sex offenses on his record."). Mr. Kimball's current financial status and future earning capacity render him indigent under § 3014, thus a $5,000 special assessment is not authorized.

## III.  CONCLUSION

For the foregoing reasons, Mr. Kimball asks the Court to impose a 240-month sentence, to be followed by five years of supervised release.

Respectfully submitted,

*/s/ Mackenzi J. Nash*
Mackenzi J. Nash, Asst. Federal Defender
FEDERAL PUBLIC DEFENDER'S OFFICE
400 Locust Street, Suite 340
Des Moines, Iowa 50309-2353
PHONE: (515) 309-9610
FAX: (515) 309-9625
E-MAIL: mackenzi_nash@fd.org
ATTORNEY FOR DEFENDANT

CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2022, I electronically filed this document with the Clerk of Court using the ECF system which will serve it on the appropriate parties.

*/s/ Mindy Guynn*, Paralegal